Forest, on behalf of the F1, Mr. Victor P. Filippini, Jr., on behalf of the athlete, Mr. Robert T. O'Donnell. May it please the Court, I am Victor Filippini, the attorney for the appellant to the City of Lake Forest. In this zoning dispute, for the plaintiff, Gandhi, to prevail, he must prove two things by clear and convincing evidence. First, that the City's zoning is arbitrary, unreasonable, and without substantial relation to the public health, safety, and welfare. And second, that the proposed use of property is reasonable. Unless a plaintiff can prove both of these elements, the plaintiff is not entitled to zoning relief. Mr. Filippini, what did you ask for from first Lake Forest and then the Court? What specifically? We actually represent the City of Lake Forest, and what Mr. Gandhi had asked for is really a 14-lot plan. The only dispute in this case is how many lots would be allowed for single-family development on the property. What did the Court's order say? The Court below found that, on the one hand, the zoning was unreasonable, a matter we can test. And second, that the 14-lot plan was reasonable, except that it needed to comply with the 66-foot wide right-of-way requirement of the City. There was no plan in the record that ever showed any such compliance. And as a result, the Court was unable to decide whether the plan was to be 13, 12, or even 11 lots. The Court simply said that the property was to be developed consistent with the R2 zoning and the 66-foot wide right-of-way. Did the Court say that it's consistent with R2, or did it say something about only the lot size of the 20,000 square feet? The Court actually said both, the R2 zoning with the 20,000 square foot lot, at different points of his oral rendition. All right, if that's the case, then why didn't the order say that he was finding that R2 is an appropriate designation for that property? Well, I would say first, I don't know why the order didn't say that, but in any event, the order could not say it, because it's not the proper role of judges to rezone property. The relief granted has to be formed in the basis of a proposed use. A specific proposed use is the language that the Supreme Court has used, and it has to be based on the record. In this case, the only specific proposed use that was ever presented to the city in the complaint, in evidence at trial, was the 14-lot plan. And that 14-lot plan did not comply with the legal requirements under the subdivision ordinance. So found the Court, so testified the attorney for Mr. Gandhi, as well as the planner who prepared the plan that was presented in all of those instances. If I may put words in your mouth, what you're saying is that the Court found that every aspect of the proposed use was reasonable, except for the right-of-way. And since the right-of-way wasn't the 66-foot right-of-way as required, which the Court determined was reasonable, you're saying that he determined that the entire proposed use was unreasonable. That's not what I'm saying. In fact, what I'm saying is that under Illinois law, for the plaintiff to prevail, he has to have a specific proposed use that is cognizable under law, that has to be reasonable. And it is unreasonable to have a plan that violates the law. We've cited case law in the Illinois Supreme Court in which the powers of a court may not be exercised to direct a remedy in contradiction to the claim requirements of a statute. In fact, if one looks at the Zeit v. Glenview case, we see nearly the same situation, where someone tries to manipulate the right-of-way in order to squeeze out more lots from a property. The Court there found that was unreasonable. In this case, the Court said, no, you can't squeeze out those extra lots. You have to drop one, two, or three. I don't think the Court said that. I thought the Court said it didn't know whether there would be any lots lost. I believe that both the Court found that there would be a reduction of one, two, or three lots, and I believe that the testimony during the trial supported that on behalf of the plaintiffs. I thought it said directly, not that there was going to be. But even if he said it, it is still undefined in the sense that it is not fixed. The trial record didn't indicate whether it was going to end up 14, 13, 12, 11, 10, or even 9. You can continue your countdown, Your Honor. I agree with you that that was a fundamental failure. So how are we supposed to review this to determine whether it's reasonable? I think that in terms of your jurisdiction, one must look at what the trial court did. What the trial court did, while finding on the one hand, and again, we don't endorse the finding about the reasonableness of the R-4 zoning, the Court then, in granting the relief, failed to resolve the fundamental point at issue. If it failed to resolve the fundamental issue, then how can you claim that the order is final? The order is final because there was nothing left for the Court to do. The fact that the Court entered an order that was defective. Couldn't the Court have said that the right-of-way would be located with the center line of the 66-foot right-of-way running down the middle of the present right-of-way? Would that have resolved the issue? There was no evidence to that effect, Judge. I didn't say it. I said, would that have resolved the issue? It would not have. Why wouldn't it have? Because the evidence or the remedy has to be based on the evidence presented to the Court. There was no evidence other than that 14-month plan. Without any evidence, from what basis would a Court enter an order? The Court cannot grant relief without supporting evidence. You take the plot, the plan, whatever you want to call it, the drawing, and it did have a 55-foot right-of-way in it, didn't it? Correct. Well, did the 55-foot right-of-way have a center line? It had a 50-foot right-of-way. Did it have a center line? It had a center line. And if you drew a line parallel, in scale, 13 feet on both sides of additional 13 feet on both sides, would that not have cited the 66-foot right-of-way? But it wouldn't have revealed what the actual lots would have been because the lots would have been thrown off in terms of their dimensions. They may not have complied with other requirements of the zoning. Could it have reduced the lots to under 20,000 square feet? It could have done that as well. We don't have any evidence of that effect. Some of those lots were merely 20,000 square feet. If you're going to encroach in them by 13 feet along the entire frontage of those lots, their lot size would no doubt be affected. And undoubtedly, for those that are at the low end of the scale, they would be below the minimum requirement, even under the R2 standard that the court was endorsing. I think what's confusing sometimes in reading these cases, at least to me, probably not to anybody else, but we talk about use versus plan, and it's almost like it's somewhat interchangeable when we talk about those two things. And it seems to me like the court said, you know, the use is okay. I don't have a problem with 20,000 square foot lots. The use appears okay. And then enters an order saying the city must accept as reasonable this use. But what you're saying is that the plan doesn't really, there is no plan that the court approved. Well, I think it's more nuanced than that. What the Illinois Supreme Court said first in the Sinclair case and the other cases, Nelson and the others, escaping as we speak, but as they decided initially, to grant the relief, it has to be based on the general characteristics of the nature of that development. In this case, the fundamental question is how many lots can be developed on this property. That is the fundamental question. Trial court did not come up with any conclusion on that. And the evidence, the only evidence presented in the record was for a 14-lot plan that was the use. A 14-lot plan that didn't comply with the ordinance. But didn't, now I've got it right, didn't the plaintiff ask for R2 zoning and isn't that what you said the court allowed? Which then, if that happened, then it isn't the court's job to, at least I think from what you said earlier, it isn't the court's job to say now you're going to have X amount of lots. Because, as he said, I expect that the city and the plaintiff will work in good faith to produce a subdivision or a property that is consistent with this finding, this R2 finding. I don't believe that that is what the case law provides. In fact, what the case law provides is that when a court rules that a zoning classification is unreasonable as applied, the effect is that the property is unzoned. And therefore, in order to avoid that outcome, there has to be a specific use proposed that will attach. And it's that use as opposed to any other. So there's no bait and switch that is the relief to be granted. The Supreme Court has been very clear about this. The whole notion of saying R2 is the acceptable zoning does not answer the question. In fact, the courts have been very protective of the separation of powers between the legislative determination of a zoning classification versus the remedy of a specific proposed use. In this case, the court did not have any specific proposed use. Rather, the court simply gave some general guidelines in the nature of legislation. That's not the job of the court. Well, how many things can you do under R2 in the Village of Lake Forest? What can you do? Can you raise dogs? Can you have houses? Can you have a cattle farm? I mean, isn't there only one use under R2? There are several uses. The primary use is single-family residential, yes. But there are other uses that can be done, particularly depending on the lot sizes that are actually utilized. Well, there weren't any variances asked for, were there? There were no variances asked for, no, not at all. But it's not a use variation. It's really just one of the classified uses. There are several classified uses that could have been employed. And to say that it's R2 doesn't answer the question. Well, normally when a trial court, maybe I'll start from the beginning and then go to the end. When a trial court renders judgment, it thinks it's rendering judgment or usually tries to render judgment for a prevailing party. So who do you think is the prevailing party in this situation? I think in the zoning case, because there are two steps. No, I said this case. In this case, I would say that because the plaintiffs did not meet both standards that are set forth by the Supreme Court, such as in the Schultz v. Lyle case, the city must be the prevailing party. How can you then appeal a case in which you are the prevailing party? I'm saying that the court ruled that the plaintiff prevailed, but because the court ruled erroneously. The plaintiff will prevail if the proposed use that he supposedly determined isn't embodied in either a meets and bounds description, or in a plat, or a survey, or any other sort of document. That, Your Honor, is exactly my point. The trial court's order failed to meet the requirements that the Supreme Court has imposed on trial courts for purposes of rendering a remedy in a zoning case. The trial court failed to do so. See, I tend to agree with you, but I'm coming from a different location. And that is that I think that the court didn't render a final and appealable judgment because he didn't do what normally is done, which is one party prevails. From what I can see of this judgment, both parties prevailed, and for purposes, as you pointed out, if this judgment is to be enforced by someone, there should be some judgment or document, some written order, that will force the parties to either agree that this is what the judge said, and then attempt to go to court to enforce it. And there is no document that I'm aware of that presents a situation where someone could say, this is what the judgment was, and I want to enforce it. Because as it is presented, it is unenforceable. And if it's unenforceable, how are we supposed to review it? Well, the final order issue here is basically, this goes to your supplemental briefing issue, and the real issue here is what did the trial court do, what more could the trial court do, and is there something for this court to decide on? What did the trial court do? The trial court found, yes, the plaintiff prevailed on the reasonableness of the R-4 zoning, and yes, the R-4 or the 14-lot plan was reasonable, except that it doesn't have a 66-foot right of way, and that has to be done. The trial court thought that was a correct decision, and on that basis, entered the final order. So what would have been done if this court were to say, oh, trial court, you're not done yet, go back and fix it. What more could this court have, the trial court could have done? There was no evidence, the evidence had closed. All the evidence was in, so there was no more evidence to take. The parties had rested, they had made their pitch as to what the outcome should be, and the court had nothing left to do but to rule. And the court made the correct ruling in terms of what was the proposed plan. It was a 14-lot plan. The court also recognized that the 14-lot plan was illegal. It didn't meet the subdivision requirements. What the court did was error by trying to split the baby. The court forgot Solomon never did split that baby. In this case, he shouldn't have. He should have realized that because the 14-lot plan was an illegal plan, even if the R-4 zoning were, in fact, unreasonable, the only decision he could have made was to fine for the city. The trial court erred in that respect, and that's the grounds on which you have jurisdiction to reverse that error and have the proper finding or the proper determination enter. You have that jurisdiction. There's no more evidence that the trial court needs to hear. There's nothing from a point of law that the trial court needs to hear. There's no other decision that the trial court needs to make. It's just a matter of, I'm sorry, is there a light that I should be looking at? No. Martin? I mean, is there a reason why the Texaco court remanded the case to the trial court to rule on yes or no? I mean, you're basically saying that we should simply repose outright. I think that's a great question because in the Texaco case, what the court did was look at the evidence and try to fashion a remedy based on the different information that was presented. In this case, there was only one piece of information presented, the 14 lot plan. In terms of the evidence regarding the sale factors, regarding value, regarding suitability, regarding all of the sale factors up and down, all of the testimony on the part of the plaintiffs related to one thing, the 14 lot plan. How much could they get for a 14 lot plan? How much was it worth? What kind of development plan would result? The only evidence was a 14 lot plan. In Texaco, there was other evidence. The court might have been able to fashion a remedy. Here, the only evidence was a 14 lot plan, which was on its face, acknowledged by the plaintiff's attorney, acknowledged by the plaintiff's planner, and found by the court to be inconsistent with the subdivision ordinance. There was only one decision that the court could have made here. That is that that proposed use, the 14 lot plan with the 50-foot wide right-of-way, was illegal. It was not authorized because, as an illegal plan, it's unreasonable as a matter of law. And I think that's the outcome that this court, as well as the trial court, should reach. If this goes back to the same judge, and Mr. Gandhi submits a plat that has a 66-foot right-of-way and X number of lots that are more or at least a minimum of 20,000 square feet, what is your position going to be relative to Ray Ciudicata and whether or not he's entitled to judgment as a matter of right? My position in the law is that that has never been presented to the City of Lake Forest. The City of Lake Forest, as the local zoning authority, is to first have a shot at it. That's the exhaustion of remedy doctrine. And as that proposal has never been presented to the City of Lake Forest, it shouldn't first be going to a court. It should first be going through the standards and processes that are established for local zoning approval so that if, in fact, this court were to remand it and he were to try to present new evidence as to a different plan, the exhaustion of remedy doctrine would say no, it's not in the right place. What doctrine? I'm sorry? You said what doctrine? The exhaustion of remedy doctrine. What about the Ray Ciudicata doctrine applied to declaratory judgments? Isn't this a declaratory judgment? It's a declaratory judgment, yes. But one of the things that, among others, is that there's an intervening zoning district, an R3 district that has never been applied for in this case, which is something, it's a one-acre district basically. And plaintiffs did not go for R3. They went from the R4 straight to the R2. They talk about in the evidence, they talk about this being a transition. Well, in fact, if you're going to have a transition, it would seem that the logical transition would be something closer than farther than what this is. We're not talking about logic. We're talking about a declaratory judgment where a trial court found that R4 was unreasonable and R2 as applied or things similar to R2 would be reasonable as long as there's a 66-foot right-of-way. Now, if that judgment is a final and appealable judgment, and we say it's affirmed on the basis that the judge was right about A and right about B, it doesn't mean that Mr. Gandhi can go and start building. All it means is the rights have been declared, which is very unusual considering I've never seen a situation, to my knowledge, where a declaratory judgment has done nothing more than declare the rights of the parties without actually having a proposed use that has been affirmed or certified as enforceable. And, Judge, I would say that to affirm the 14-lot plan with the modification is itself a fundamental error and problem because what that means is that all of the evidence that the trial court relied upon was on the 14-lot plan. But the 14-lot plan isn't what's being approved. So there's a bait-and-switch with the evidence here. Wasn't the 14-lot plan as written or as drawn? Didn't it have lots that were in compliance with R2? All of the testimony with respect to the value of the property, the suitability of the property for its own purpose, et cetera, was based on the 14-lot plan. It was not based on something less. Well, you know, you could be looking at this thing either through the front or the back end of a spyglass. It could either be 14 lots or it could be 20,000 feet divided into the total acreage, which would come out with, if you subtracted the square footage of a 50- or 55-foot right-of-way, you'd come out with 20,000 square foot lots. That would be a fundamental change in the way owner's owning law has been implemented for the last 50 years to suddenly say, yes, we'll give you just parameters and go figure it out. In fact, the case law has consistently provided that the zoning relief has to be based on a specific proposed use. That is not the case here. The problem is that the specific proposed use in this instance was illegal. The trial court realized it. The trial court, trying to fashion some kind of remedy, thought, okay, I'll split this baby. It's not a baby that can be split. Well, then what did the trial court mean when it said, and the last line should be, that the court orders that the R-4 zoning shall not be applied to the subject property and that the city will accept a reasonable use as tentatively set forth in Plaintiff's Exhibit No. 6, that the city shall accept as reasonable the tentative plan. What does that mean? I mean, he's approving that plan. That's exactly right. He approved an illegal plan. That he cannot do. What we actually have seen, and if you look at the Tillman v. Northcourt case, it's a good example of a situation where zoning was found to be unreasonable. A proposed plan was presented by the plaintiff. The village showed that there's an intermediate plan that would have been reasonable. The outcome of that case was that the court said, yes, an intermediate plan is reasonable. The proposed plan is not. Therefore, plaintiff, you lose. That's exactly what should happen here. That's the process. Because this emanates from the local zoning ordinance, something which is to be handled at the local level, one has to go through that process. The courts are not here to intervene as to that process. The courts are not a super zoning board of appeals. Rather, the courts are to make specific adjudications based on the facts presented. In this case, the court tried to do more. It's not saying that that's a bad intent. It's just saying it's a wrong result under Illinois law. And that's how this case needs to be decided, that, in fact, there was not a proposed plan that met the reasonableness standard because it was illegal. If you don't meet both of those standards, proving that the underlying zoning is unreasonable and that the proposed plan is reasonable, you lose as a plaintiff. In this case, plaintiffs failed to do so. Plaintiffs must lose. I have one more question. And that is, do you see any difference between a dismissal and an affirmance? A dismissal? On the basis that we don't have jurisdiction to entertain or determine the validity of this judgment because it is unreviewable, what are the implications of that if it goes back to the trial court as opposed to an affirmance? I think that if you were to dismiss it, the trial court would be confronted with the decision that he should have made in the first place, namely that he has an illegal zoning proposal and he can't grant that illegal relief. Well, it could also mean that the judgment is effectively affirmed, which means that in all its spoofy acts, pardon me, in all its eccentric aspects, it's affirmed. I don't believe so because how could we have a final decision rendered against us that is not appealable? That would be violative of our department's rights. Because it goes back to the trial court and this thing is finally resolved one way or the other, which is that a document is prepared with a 66-foot right-of-way and it has a certain number of lots conforming with apparently the 20,000-square-foot minimum that the trial court apparently thought was the minimum reasonable size of the lots. And then he either at that time says, yes, this is what I meant all along. Eureka, I have found it, you know. Or he says, no, this isn't what I meant. Well, and were the judge to take on that role, then he should not be sitting in the courthouse. He should be sitting on the dais of the Zoning Board of Appeals because that's what he's doing, and that is not his role. Didn't he recognize that, though, when he said, I make no finding as to what the final subdivision will look like? That takes some good faith efforts between the city and the plaintiff, which I'm sure will occur. And I'm sure that the judge intended to get it right. The problem is he has to fashion a specific proposal as the zoning relief. He did not. He could not. And that is the fundamental problem here. There are two requirements, and only one has been met. And in the absence of both of those requirements being met, plaintiff cannot prevail. And that is why we have asked that this court reverse the trial court. I don't know where I am in time, and I'm sorry, I don't see a light, so. You've gone way past it. But we're sage justices that believe that justice isn't based upon the amount of time that is spent during oral argument. I do appreciate that, and I will be happy to come back after Mr. O'Donnell has his. You'll have an opportunity for rebuttal. Thank you. Good afternoon, Your Honor. Good afternoon. Robert O'Donnell on behalf of Mr. Gandhi. Mr. O'Donnell, can I just start off with one quick question? Certainly. You take this order that Judge McCoskey signed on March 1909. What do you do with it? What does Mr. Gandhi do with it? Because basically, Judge McCoskey said, I'm approving your plan as reasonable, your use as reasonable. Go back to the city and work this out. So what do you do with it? How do you afford it? What do you do with this order? Justice Perkin, answering your question, I'm going to answer the same question Justice McClaren asked Mr. Filippini at the end, which is, what's the difference between an affirmance and a dismissal? After the trial court made its ruling, whether the city appealed or didn't appeal, we had one task. We started with that Plaintiff's Exhibit 6 that Judge McCoskey referred to. It was a fully engineered plan in all of its respects, complied in every way, shape, or form with all of the regulations, ordinances of the city of Lake Forest. So it wasn't just a bunch of lobster on a piece of paper with a road through it. It was a fully engineered plan. In light of Judge McCoskey's ruling, we will take that plan and, in effect, do what Justice McClaren said early on in Mr. Filippini's argument, and that is impose a 66-foot wide right-of-way. Keep in mind that the plan currently exists with an effective 70-foot right-of-way. We have a 50-foot right-of-way with two 10-foot easements on either side. So to take that and convert it to a 66-foot wide right-of-way does not do great harm to that plan. However, the consequence of imposing that 66-foot wide right-of-way will cause a geometric adjustment in certain of the lots. Certain of the lots that are well in excess of 20,000 square feet, their size will change, but they will still be compliant with 20,000 square foot minimum. There are a few lots that maybe, and I looked at the record and Judge McCoskey clearly said maybe, may cause the loss of a couple of lots in order to achieve that 20,000 square foot minimum. So specifically, what we would have done with that order is make that, in effect, geometric adjustment to a fully engineered plan, presented it to the City of Lake Forest for final approval and building permits and proceed from there. That would have been entirely consistent with what Judge McCoskey ruled. Now, to come and answer your question, Justice McLaren, I don't think we will do anything different if this were dismissed or affirmed. We still have to make that adjustment, but it's a geometric adjustment. It doesn't mean the plan is illegal. Keep in mind— But what if the City passes on this new plan again? I mean, you have to propose it to the City again. Sure, we have to get building permits, certainly. We have to go back to the City, and the City would certainly have the right to determine, well, did they provide a 66-foot wide right-of-way? Well, do you have 20,000 square foot minimum lots? But all of the other engineering particulars, important particulars, but particulars of that plan remain fixed, and that's why Judge McCoskey ruled what he did. He was dealing with a fully engineered plan. We have stormwater detention adequately provided for. We have an entranceway adequately provided for. Everything was adequately and properly provided for. So all you need to do is increase the right-of-way width of the road and geometrically adjust the lots. Maybe because you were just off a little bit, maybe that's why he wanted to split the baby. Maybe that's why he said, you know, you are so close, Mr. Gandhi, but your right-of-way is violative of the subdivision ordinance. And it was, correct? It was. I'm hesitant to call it violative or illegal for this reason, that the right-of-way width under the City's ordinance is not something that's addressed until final plan. And what the evidence showed and the record reveals is that in the most recent example across the street where we have a rezoning from R5 to R2, what the City did there, because the City invites a request for rezoning and subdivision approval to be submitted simultaneously, so when they're considering the rezoning, they can see a specific plan, which we did. In our instance, unlike what they did across the street, they refused to consider any of the subdivision issues that we presented. The application, going back to your question early on, Justice Hutchinson, what did we ask for? What we asked for was to have the property rezoned R4 to R2. We also asked for subdivision approval. In the context of that request for subdivision approval, we asked that the right-of-way width be modified to allow for 50 feet wide with two 10-foot easements on either side. The City refused to consider it. They didn't say yes. They didn't say no. They refused to consider it. Their response being, well, since we're denying the rezoning, we don't really have to get to, and we won't get to, the issues attendant to subdivision. So when we go to the trial court, we went with that same plan because the City's position was, we're not answering your questions. Keep in mind, their first response when we filed the lawsuit was to move to dismiss, saying we failed to exhaust our administrative remedies because we were coming before the trial court without the trial court ever having considered the subdivision issues. Well, that was denied because we said we brought the subdivision issues to your attention. You refused to consider them. So in a sense, they did try to put you in. You're saying that you didn't have to exhaust your administrative remedies because they refused to give you any administrative remedies. That's correct. And the specific administrative remedy we're talking about is the same one, the relief from the 66-foot wide right-of-way. What else can you do in an R2 zone? What can you do in an R2 zone in Lake Forest? No family homes, period. That's it? That's it. You can't put farms. You can't put horses. You can't do it. And you're not asking for anything of that nature. No, absolutely not. And the difference between this case and the Texaco-Schoenberg case, the Norwood case, the other cases cited by the City, there what the trial court did was presented with multi-use plans. And the trial court approved certain of the uses and not other of the uses. We don't have that here. We have, and I don't mean to minimize the right-of-way issue, but we have a detail. We have a detail that requires adjustment to a fully engineered plan, which we had to make after the trial court ruled whether there was an appeal. We would have to do it if this court dismisses, and we would have to do it if this court affirms. Why didn't you file a cross-appeal seeking to reverse the trial court's ruling relative to the 66-foot right-of-way and claim that the 50 was sufficient? We could have, but frankly, Your Honor, it's such a minor issue in terms of what it will impose upon the plan. It might cause a loss. Our assessment, one lot, maybe one. And it frankly, whether we got 14 or whether we got 13, it was acceptable to the owner. What about if you only get 10? It's a mathematical impossibility. But if it happens, it happens, Your Honor. It just couldn't happen that way. If you take the plan and make the adjustment, you don't lose four lots, you don't lose three, you don't even lose two. I'm not even sure you lose one. And that was really what the evidence was. That evidence came from our planner. He was asked on cross-examination, well, maybe even by the trial court, he was asked, well, what happens if you have to put a 66-foot wide right-of-way? In effect, his answer was, no big deal, it might cause the loss of a lot or two. But that's something that ordinarily happens as you move through preliminary plan toward final plan. In point of fact, as the evidence showed, that's what happened on the rezoning across the street. There was, in the details, the loss of a couple of lots. And that was only a five-lot subdivision. If you had lost, if the trial court had said, you know what, our four is unreasonable, I agree with you. And I think this plan looks really good. I think this plan looks really good. But it violates an ordinance that I think is enforceable, and the city has the right to enforce the 66-foot right-of-way for safety reasons, so on and so forth. So I'm not going to approve your plan. And you lose. I mean, realistically, as you said, you walk out, you're no different than you are now. You walk out, you redo the plan, you go back to the city with R2 zoning, with a 66-foot right-of-way, maybe you take a lot or two off. You go back to the city and go, here it goes. Now, again, the process has to start over again. I understand that. And then the city can approve or disapprove it. Maybe you go back to the trial court again. Maybe there is some multiplicity of litigation. But, I mean, the time that we're spending on this appeal, it just seems like you're almost losing by winning to some degree. I don't think so. What would have happened, and I'm assuming by the court's question you're saying that the trial court had made two findings. One, R4 is unreasonable. Right. And R2 is reasonable. Right. But you don't have a plan. Right. Well, A, with all due respect, that isn't the record. We do have a plan, and the court did approve the plan. Not that you don't have a plan, but your plan is violating the law, which I think is reasonable, so I can't approve your plan. Well, if the court would have made those two declarations of law, and let's leave appellate processes aside, then I tend to agree with the court that we could have, assuming that the city would not have appealed, and that's a proper, lawful decision by a circuit court. We could go back and say, here, city, here's a fully engineered, you know, 66-foot wide right-of-way R2 plan, period, end of story, we win. That's answering the court's question. I don't know how, you know, I don't know if that's actually the way it would have played out. Yeah. Yes. You did? Yes. Did I consider it? Yes. Oh, you didn't do it. In retrospect, the answer is yes. Did you wish you would have? Yes. But you didn't ask specifically of the city or of the court for a variant. We did ask the city, and we did ask the court. But the city denied even talking about it. Didn't talk about it. Because I'm looking through your complaint, and I can't find where you asked for variance. We asked that the plan be approved, and the plan has a right-of-way of 50 feet. Interestingly, in the DeMarie case, which is DeMarie versus the City of Lake Forest property immediately next door, where there was a zoning dispute, city lost, a plan approved. That plan, the trial court did there, what the trial court could have done here is allowed a right-of-way width of 36 feet. 36 feet. So, clearly, Judge McCoskey could have approved the plan with a 50-foot right-of-way and the two 10-foot easements. In effect, and I don't think he was, I don't think he was, I think he was simply reluctant to, in effect, grant a variance that the city, for whatever reason, chose not to even consider. So, the city prevailed on that issue, and by prevailing on that issue, the city stands to get, in part at least, what it's looking for, and that is fewer than 14 lots. Whether that turns out to be the case or not will be reflected in the next plan. So, the whole notion here that we're talking about, you know, something that's illegal, we're talking about a detail, and I say detail only in the context of having a fully engineered, no doubt about it, fully engineered plan. So, it becomes a detail. All other items remain fixed. We make this adjustment. Do you lose a lot? Do you lose two? That's what the trial court's ruling was. But the trial court was very clear. Our four is unreasonable. The proposed use, and you've made the finding twice, the proposed use is reasonable as reflected in Plaintiff's Exhibit No. 6 with an adjustment. But the Sinclair Pipe case says that the court's decree must be framed with reference to the specific plan proposed, your specific plan proposed, albeit partially because the city wouldn't hear it earlier. Maybe you would have amended your plan if the city had heard it and said, hey, you know, we pointed that out to you regarding the right-of-way. But the specific plan proposed has this right-of-way on it that does not conform to the subdivision ordinance that Judge McCoskey, whether you call it illegal or whatever, I mean, that's a bad term, but he felt that it was reasonable for the city to be able to rely on that ordinance. You're not arguing that's against the manifest way to the evidence. I haven't seen that argument. But Sinclair Pipe says specific use. In Sinclair Pipe, there wasn't even a plan submitted to the court. Sinclair Pipe didn't have a specific plan. Well, it says that's why I get confused. Again, the specific use proposed must be introduced into evidence and the court's decree must be framed with reference to the specific plan proposed. So it's like the court. I don't know. Are they the same thing? Are they different? And your Honor, I think they're I think they're different. The case law is with respect to specific uses. The specific uses, with some exception, are in the context of a specific plan. This plan, this plan, Plaintiff's Exhibit 6, went far beyond what is required in terms of identifying uses for a court to determine are proper or not. The whole notion of a specific use, it's the purpose of a specific plan or specific use, is twofold. It's to bind the landowner and the municipality to a specific use or plan and prevent a multiplicity of litigation. That's the stated purposes of having the uses or the plan or the uses specified in a plan. What's the source for that authority? It's Texaco-Schomburg. Thank you. And that's why I'm emphasizing what this plan was. We're required to make an adjustment. There are a number of cases, Norwood being one, where the court, the appellate court recognizes that in the final vetting of the plan, the density may change. And that's often the context in which it's expressed. Well, that clearly reveals the fact that the plan that is approved by the trial court, affirmed on appeal or the subject of an appeal, is not in all of its particulars that precise. Here we have one detail. Thank you, Your Honor. Thank you. The one detail that Mr. O'Donnell points to is almost the punchline to the other than that, Mrs. Lincoln, how was the show? The one detail, in fact, is how many lots can be there. And the number of lots is the issue in this case. And the trial court did not reach that determination. According to the zoning classification, it's not the number of lots but the size of the lots. I should note a couple of things on that. First, with respect to the subdivision, while Mr. O'Donnell suggested that a variation was sought, the variation was sought in order to increase the lot yield. The subdivision ordinance allows for variations but not for purposes of increasing the lot yield. So it's not a matter of the city simply refused to do it. Subdivision ordinance requires, in order for a review of the subdivision, that it has to comply with zoning and it has to otherwise meet the standards of the subdivision ordinance. This plan, under no circumstance, could comply with the zoning. Why? Even with the R2, it didn't comply with the zoning with the 66-foot-wide right-of-way. It needed a variation. And that variation, in their instance, was only for the purpose of maximizing lot yield. And that is not a permitted variation. So there was no variation that they could have ultimately gotten. They could ask, but it didn't qualify. Could I interrupt you and ask you, are you suggesting that this judgment is an oxymoron? In which fashion? There's a number of different fashions I would suggest. In that it is internally inconsistent. It cannot be consistent throughout. If, in fact, it is reasonable to impose R2 zoning, and R2 zoning requires 20,000 square foot lots and a 66-foot right-of-way, and supposedly, depending on which individual I listen to, it's either going to be 14 or 13 lots, then this judgment is inconsistent because it isn't finalized to the extent that it is not concrete. We don't know whether this is 13 lots or 14 lots, taken in the best light of your interpretation of what the trial court did or should have done. No, I think that it's oxymoronic for other reasons, but let me answer your question. As far as the number of lots, the testimony of the plaintiff or the plaintiff's own planner, the one who drew the plan, said one or two lots would be lost. Mr. O'Donnell's suggestion otherwise is his suggestion, not the testimony of his own planner. As far as what the court did, what the court did was to try to do something he wasn't authorized to do, namely to try to fashion a remedy outside of the evidence and the plan that was presented. I think that insofar as the absence of a final determination, that's a direct outcome from the fact that the plaintiff's words and evidence- Are you very sure you meant what you said when you said that it was outside the evidence as opposed to outside the pleadings? It was outside the evidence. There was no evidence as to what a 13 or 12 or any other size lot, other than the 14 lot plan, would look like. Mr. O'Donnell suggested in his argument that it was a fully engineered plan. It had never undergone engineering review. He says it was a fully engineered plan. Guess what? Under the subdivision requirements, the city engineer has to make that determination. The determination was never done. But when does that happen if you deny the zoning? The reason why it didn't happen is that they could not meet the thresholds to even start. If I came in and said I want to build an office building, here's the plans for the Sears Tower in the city of Lake Forest, must the city go through detailed engineering as to that Sears Tower when it's so plainly not allowed under the ordinance? I think the answer is obviously no. In this instance, they were asking for a subdivision which had a substandard right-of-way. They were asking for a variation for the subdivision that would only be for the purpose of maximizing lot yield. The specific variation provisions of the subdivision ordinance says you can vary that right-of-way, but not for purposes of maximizing lot yield. One of the other examples, and Mr. O'Donnell alluded to it in terms of the DeMarie case, was the 36-foot wide right-of-way adjacent to it. That was in the context of a special use permit. That was also a court order. That was not zoning of the city of Lake Forest. So the city never approved a 36-foot wide right-of-way. When you're talking a straight subdivision, it's a 6-foot wide standard. That's what they were required to comply with. They did not. Instead, they asked for a variation which was untainable. And then they said, well, the city never gave us a variation. We couldn't. So that's not an excuse on their part that they can then say, therefore, the city is wrong. We should approve our plan. They still can't comply. The city can exercise, you know, some discretion and can offer. That's what a variance is. It is a difference in what the ordinance allows, and it can be done if the city so chooses. The city chose not to. I accept that. But it doesn't say they can't. Well, no. In fact, variations are only authorized to the extent permitted in the underlying ordinance. The subdivision ordinance did not provide that discretion. Therefore, that type of relief was not available. Did the zoning ordinance, or are they one and the same? The zoning ordinance has different provisions. The 66-foot wide right-of-way was in the subdivision ordinance. That is unchallenged. It does not allow for the type of variation sought. There was no variation sought before the Zoning Board of Appeals. It wasn't even applied for. Okay. Well, then what we have here is R-2 zoning that now when he goes to subdivide may result in some other litigation because now he might be asking for a variance, but he has R-2 zoning if I read the court's ordinance. Again, I don't think that that's the right answer either because the R-2 zoning is based on the 14-lot plan. No, R-2 zoning is based on a minimum of 20,000 feet pursuant to the ordinance. No, but the court can't say R-2 zoning is what you have. That's not what the court can say. In fact, if there were Can the court say reasonable lot size for this subdivision is 20,000 square feet minimum? I don't think so because, again, when we get down to it, what the requirements are in terms of the Sinclair case and its progeny is that and in the appellee's briefs there was much made about intimate details, but what it says is that the general characteristics which bear on the reasonableness of the zoning restriction are the things that are needed to make a determination as to what the reasonableness of that plan is. In this case, the only dispute is the lot yield, and the characteristics of the lot yield is what the court did not decide. So, no, the court can't simply say, oh, we're going to when the issue is how many lots can be developed on this property, the court can't say, well, we're going to follow the R-2 standards. We're going to follow this standard. The court has to make the decision based on a proposed use. That's not the proposed use of the property. In fact, if you look at this, there are three districts, R-4, R-3, R-2, all of which are the predominant uses are single-family residential detached dwellings. In fact, all of those districts also allow other uses, but they require either additional lot area or something else than the minimum. But all of them require or allow single-family detached dwellings, just different lot sizes. So the only issue, the only issue is how many lots can be built on that property. Now, if the proposed plan of 14 lots met the standards, then I would say, yes, the court could have said, I approve the 14-lot plan. But that is not what the case was. And, in fact, as a result, there could have been an R-3 plan that would have been reasonable. If there's an R-3 plan that's reasonable, then the R-2 plan isn't good enough because there's an intervening zoning district. And we don't have that before you in the record because plaintiffs never put on their case other than with an illegal plan. And that is the basis on which the court ruled. Well, they didn't want R-3. Why would they differentiate R-3? They wanted R-2. And they put on evidence that there's some R-4 here, there's some R-2 here, you know, and it's noted on the plaque. They didn't want R-3. So why can't a village say, well, because you didn't ask for it, you're not entitled to R-2? That's what I think I hear you say. Well, in fact, that's what various decisions, including the Pillman case, have found, that the fact that someone might ask for R-2 in this instance doesn't mean that an R-3 development wouldn't be reasonable. And if it would, then the R-2 does not afford them zoning relief. In this case, even if they're both reasonable, then the outcome is really that the lower density, the one closer to the underlying zoning, is the one that governs. And in this instance, plaintiff only presented the illegal 14-lot plan, and the court could not grant relief on that basis. So if they reverse it, what happens? If you reverse it, then plaintiff has the – ultimately, in some respects, Judge, we're in the same situation under any circumstance because there is no ability – and Mr. O'Donnell suggested they just have to come in for a building permit. That's not true. There still is a subdivision process that has never been engaged. And, in fact, that needs to be engaged in order to get a building permit. So under any circumstance, they need to comply with the ordinances. I'm not talking about going and getting permits from you and things of that nature. I'm talking about if we reverse this and they want relief, is this going to go back to the trial court again? No. If they want relief, they have to go back to the city and ask for it with a proper plan that would be afforded – that could be afforded approval based on our ordinances. So it's your contention that they couldn't file another lawsuit, make the same allegations, and submit a new plan, document, whatever, that shows 13 lots and a 66-foot right-of-way, and the judge says, Eureka, you found it. I rule that this is reasonable. I would say that that has allowed the judge to step into the shoes of the zoning authority, and that's not what the courts ought to do.  You see, you asked us to reverse something, and you didn't ask – we can reverse it on bases other than finding that the entire declaration between the parties is wrong. We could find that his suggestion that this proposed use of 14 or 13 lots of roughly 20,000 square feet was a proper determination. But we then could also say, but based upon the 66-foot right-of-way, he also committed what might be an oxymoron, a paradox, a contradiction, and says you can't do it this way because what you propose doesn't have a 66-foot right-of-way in it. So we could – we could quote-unquote reverse them on the basis that the relief that was granted was incorrect to the extent that it's inconsistent, but it doesn't mean that both inconsistencies are – are supposedly – disqualifies the plaintiff from getting relief. And going back to the trial court and saying let's do it right this time. And I don't think that the plaintiff can go back to the trial court on a plan that has never been presented to the city. That's what the exhaustion of remedies doctrine would provide. So for the court to take that step and say you just need to redraw the lines and knock off a lot or two and just come back to me and I'll approve it, we may as well give him a new title as opposed to trial court and circuit judge and make him zoning czar of Link-Soled Forest. That's not what his role is. Well, I don't think he's a Democrat in any of that. Thank you very much. Thank you. We enjoyed the lively argument.